## Wytheville.

WILLIAM B. HIBBS AND WILLIAM W. SPAID, PARTNERS
TRADING AS W. B. HIBBS & COMPANY, v. FIRST
NATIONAL BANK OF ALEXANDRIA, VA., ET AL.

June 15, 1922.

1. MISTAKE AND ACCIDENT—*Mistake of Fact—Brokers' Authority to Sell Certain Shares of Stock, Selling Shares of Similar Name—Case at Bar.*—In the instant case, defendant, Duffey, placed a certificate of 100 shares of stock in the hands of defendant bank for sale, who delivered the certificate to plaintiffs, brokers, for the same purpose. This certificate of stock had no market value. Plaintiffs, in the absence of notice to the contrary, would assume that the bank was acting for a client and was not the owner of the stock. Plaintiffs wired their correspondent to sell 100 shares of the stock and through a mistake of an employee of the correspondent, the correspondent sold 100 shares of stock of a similar name. Plaintiffs remitted the proceeds of this sale to defendant bank, who placed the same to the credit of defendant, Duffey, who drew several checks upon the account, with one of which he paid a third party, who owned one-half of the certificate, his portion of the proceeds.

   *Held:* That plaintiffs could not recover from either the defendant bank or the defendant Duffey.

2. MISTAKE AND ACCIDENT—*Recovery of Money Paid Under Mistake of Fact—General Rule.*—The principle upon which a right of recovery is based, in the case of money paid by mistake of fact, is well settled. The right of recovery, where it exists, is based upon the promise to return the money which the law implies, irrespective of any actual promise, and even against the refusal to make it, whenever the circumstances are such that *ex aequo et bono* the money should be paid back, but in such case only.

3. MISTAKE AND ACCIDENT—*Recovery of Money Paid Under Mistake of Fact—Change in Position of Payee.*—It is well settled that money paid under a mistake of fact cannot be recovered back where the payment has caused such a change in the position of the payee that it would be unjust to require him to refund.

4. MISTAKE AND ACCIDENT—*Recovery of Money Paid Under Mistake of Fact—Change in Position of Payee—Case at Bar.*—In the instant case, an action to recover money paid under a mistake, the mistake was made by an agent of plaintiffs, for whose selection the defendant

bank was in no way responsible. The bank, upon receipt of the payment and in reliance thereon, before it had any notice of the mistake, placed the money to the credit of its customer, thereby changing its relation with the customer from an agent to sell a certificate of stock to that of a debtor of the customer. Thereafter the bank had no right to charge back the amount of the deposit against the account of the customer without his consent.

*Held:* That as the *status quo ante* had been changed, it would be unjust that the bank should be required to refund to plaintiffs.

5. MISTAKE AND ACCIDENT—*Recovery of Money Paid Under Mistake of Fact—Change in Position of Payee—Duty of Payee to Institute Interpleader Proceedings.*—In the instant case where plaintiffs, brokers, had paid defendant bank a sum of money under a mistake of fact, which sum defendant bank had placed to the credit of its customer, for whom it was acting, it was not the duty of the bank to institute interpleader proceedings, convening the plaintiffs, its customer, and third party having an interest, before the court. The bank would have owed such duty only had it had control of the money at the time it received notice of the mistake, and as it had become the debtor of its customer for the money before it received such notice, no such duty arose.

6. MISTAKE AND ACCIDENT—*Recovery of Money Paid Under Mistake of Fact—Change in Position of Payee—Case at Bar.*—Plaintiffs, brokers, under a mistake of fact, paid a sum of money to a bank, who placed it to the credit of their customer, for whom they were acting. Thereupon the customer gave a check upon the account to a third party claiming an interest in the transaction, and although upon a discovery of the mistake payment was stopped upon this check, its payment was enforced by legal proceedings.

*Held:* That it would be unjust to require the customer to refund that portion of the money to the plaintiffs, unless it appeared that the customer caused the plaintiffs to lose some remedy of theirs against the third party, or the bank, which did not so appear.

7. VERDICT—*Conflict in Evidence—Conflict Determined by Verdict.*—Conflict in the evidence presents a question of the credibility of the witnesses, and a verdict for defendant concludes such question in his favor.

8. MISTAKE AND ACCIDENT—*Recovery of Money Paid Under Mistake of Fact—Change in Position of Payee—Accord and Satisfaction—Case at Bar.*—In the instant case, plaintiffs, brokers, owing to a mistake in a stock transaction, paid a bank a sum of money which the defendant bank credited to the account of a customer, for whom it was acting. The customer paid over half of the money in question to a debtor of his and applied the other half to the debtor's indebtedness to him, in pursuance of a prior understanding.

*Held:* That the customer's acquittance of the debtor of his indebtedness constituted such a change in his position that it would be unjust to require him to refund such money to the plaintiffs. The trans-

action amounted to an accord and satisfaction; and it appeared from the evidence that the indebtedness would have been worth something to the customer.

9. ACCORD AND SATISFACTION—*Unliquidated Demand—Liquidated Demand—Common Law—Code of 1919, Sec. 5765—Case at Bar.*—An agreement between a debtor and his creditor, fixing the amount of an unliquidated demand, constituted an accord, and the application by the creditor of one-half of the money received from the sale of a certificate of stock given him by the debtor for that purpose to the satisfaction in full of the indebtedness and his complete acquittance of the debtor from the obligation thereof, in pursuance of a prior agreement authorizing him so to do, while that agreement still existed, executed the accord; so that, at common law, the accord and satisfaction became complete. And even if the indebtedness was a liquidated demand, the application of the money was an express acceptance thereof by the creditor in full satisfaction of the debt, in pursuance of the prior agreement; so that, under section 5765 of the Code of 1919, the same result followed.

Error to a judgment of the Circuit Court of the city of Alexandria in an action of assumpsit. Judgment for defendants. Plaintiffs assign error.

*Affirmed.*

This is an action of trespass on the case in assumpsit, brought by the plaintiffs in error (who will be hereinafter designated the plaintiffs), against the defendants in error (who will be hereinafter designated as the defendants, or as the bank and Duffey, respectively), to recover back the sum of $1,609.80 paid by the plaintiffs to the bank under a mistake of fact discovered after the money was so paid and of which the bank and Duffey had no notice until after the bank had placed the money to the credit of the checking account of Duffey, and the latter had so acted, as he claims, as to have changed his *status quo ante* to his detriment and injury, if the recovery or any part thereof sought against him were allowed.

There was a verdict and judgment in favor of both of the defendants and the plaintiffs allege error.

The transaction and the material circumstances under which the money was paid to defendant bank by the plaintiffs; under what mistake the money was paid; and the circumstances under which the bank refused to refund the money to the plaintiffs, as shown by the evidence without conflict therein, in so far as the bank and the plaintiffs are concerned, were as follows:

On December 5, 1919, the bank sent to the plaintiffs a certificate of 100 shares of "Ventura Oil Development Company" stock, together with an order in writing instructing the plaintiffs, who were brokers engaged in the business of buying and selling stocks, etc., for customers, to sell this stock. The plaintiffs were not informed whether the bank was the owner of the stock or was merely acting for some one else who was the owner; but the testimony, both for plaintiffs and the bank, was to the effect that, in accordance with the usual course of business, the plaintiffs, in all such cases, in the absence of notice to the contrary, assumed and acted upon the assumption that the bank was not the owner of the stock, but was having it sold for some client of the bank who was the owner of it. Thereupon, on the same day, December 5th, the plaintiffs wired their New York correspondent to sell 100 shares of Ventura Oil Development Company stock at the market price. The New York correspondent failed to find any market for the stock in New York city or in several other markets, other than Boston, after several days of efforts to make the sale, and, thereupon, wired the plaintiffs, informing them of such result. The plaintiffs, in turn, thereupon, on December 8th, wrote the bank, referring to its "order for the sale of 100 shares of Ventura Development Company," stating that they had "tried practically every market, but

had been unable to obtain any quotation on the stock," and said that they held the stock awaiting further instructions from the bank. The bank promptly replied by letter addressed to the plaintiffs, the contents of which were as follows: "We have yours of 8th inst., stating that you have been unable to find a market for the 100 Ventura Development Company stock, sent you a few days ago by us for sale. We were under the impression that this was dealt in in Boston. If we are mistaken, however, will you kindly return the certificate to us  *  ." Thereupon the plaintiffs, on December 11th, wired their New York correspondent aforesaid to transfer the order for the sale of the 100 Ventura Oil Development Company stock to a correspondent of the plaintiffs in Boston. The New York correspondent of the plaintiffs thereupon wired the Boston correspondent of the plaintiffs over their private wire, to sell "100 Ventura Oil Development," as a member of that firm testified, for the account of the plaintiffs. But, as a member of the firm, which was the Boston correspondent aforesaid, testified, the message, as received by the Boston correspondent, read as follows: "Sell 100 Ventura" for account of plaintiffs. Mr. Spaid, one of the plaintiffs, testified that this mistake was made either by the sending or receiving operator of the wire—the employee of their correspondent in New York, or of their correspondent in Boston—who handled this message; that "the mistake was between the two operators. We do not know which one." On receipt of this message the Boston correspondent of the plaintiffs, on December 11th, sold on the Boston market "100 shares of Ventura Consolidated Oil Fields" stock at 16½, which was the stock of a wholly different corporation from that of "Ventura Oil

Development Company;" the stock which was sold being, however, commonly known and dealt in on the Boston market as "Ventura." On making such sale the Boston correspondent wired the plaintiffs that they had sold "100 Ventura," at 16½, for their account. On receipt of this advice the plaintiffs, on the same day, December 11th, wrote the bank as follows:

"We beg to advise you we have this day for your account and risk sold 100 Ventura Oil Development Company, price 16½—commission $15.00—taxes .20—credit $1,609.80." On December 12th the plaintiffs mailed a check to the bank for such net proceeds of sale, to-wit, for $1,609.80. This remittance was received by the bank on December 13th. The bank thereupon phoned to Capt. Duffey, for whom the bank had been acting in making the sale of the stock, that the bank was crediting his account with the $1,609.80, the net proceeds of the sale; and, accordingly, the bank that day placed that sum to the credit of the checking account of Duffey with the bank.

Meanwhile, on receipt by the plaintiffs of the aforesaid advice from their Boston correspondent of the sale aforesaid, the plaintiffs forwarded to such correspondent the aforesaid certificate of stock. It arrived in Boston on December 18th. Whereupon the Boston correspondent of the plaintiffs discovered the mistake that had been made, which had resulted in their selling of a wholly different stock from that which the plaintiffs had intended for them to sell. Thereupon the Boston correspondent wired the plaintiffs, informing them of the mistake, and later in the day the plaintiffs received another message from their Boston correspondent, in which it was mentioned that the certificate of stock forwarded, as

aforesaid, was of the "Ventura Oil Development Company, of California," and that the stock the correspondent had sold was of the "Ventura Consolidated Oil Fields, incorporated under the laws of Maine," and that the office of the latter corporation knew nothing about the stock forwarded, and that the corporation had never heard of it. Thereupon, plaintiffs, promptly, on the same day, December 18th, called the bank over the phone and informed the bank of the mistake that had occurred; and wired their Boston correspondent to protect them the best they could. Thereupon the Boston correspondent bought 100 shares of "Ventura Consolidated Oil Fields" stock at the market price, which was then 16, for the account of the plaintiffs; so that the loss of the plaintiffs on the actual dealing in this stock was a trifling amount, to-wit, $5.20, for which they make no demand in this action, confining their claim to the demand for the return to them of the $1,609.80 paid to the bank, as aforesaid, under the aforesaid mistake of fact.

We come now to circumstances which are material only as bearing on the question of the liability of the defendant, Capt. Duffey, about none of which is there any conflict in the evidence, however, save one fact, which conflict in evidence will be hereinafter pointed out.

When the bank was informed, over the phone, by the plaintiffs, as aforesaid, of the mistake aforesaid, which had occurred, the cashier of the bank (with whom the conversation was being had), told the plaintiff, Spaid (who was doing the talking for plaintiffs), that the bank would get in touch with its client immediately. Thereupon, the cashier called Capt. Duffey, the client referred to, over the phone and the latter came promptly to the bank, was told of

the mistake which had occurred, and the cashier also
told him that he had better go right over and see the
plaintiffs and try and adjust the matter.    Accordingly
Capt. Duffey immediately went over to Washington
city, to the place of business of the plaintiffs, and had
an interview with the plaintiff, Mr. Spaid, which the
testimony of Duffey describes as not at all satisfactory.
Duffey's testimony on the subject of what transpired
at this interview is to the following effect: That
Duffey told Spaid who he was, the reason he had called
about the stock transaction, and explained his own
(Duffey's) situation and the bank's situation; that
he explained the circumstances (which will be herein-
after more particularly referred to), attending his
getting the bank to sell the stock, by reason of which
a Mr. Sprague (as will be hereinafter set forth more
at length), had an interest in the money derived
from the sale of the stock; that he told Spaid that he
(Duffey) had disbursed the money which the bank
had placed to his credit as derived from the sale of the
stock before the bank notified him of the aforesaid
mistake, or at least had given other people checks on
it, including a check to Sprague for his share of it.
That while he (Duffey) was talking, Spaid paid but
little attention to him, walking away to talk with his
stenographer at one time, and engaging in a conver-
sation at another time with some young man who
came into the office; that Spaid told Duffey that the
plaintiffs were looking to the bank, and, in effect, that
the plaintiffs did not recognize or look to him (Duffey)
in any way whatsoever; and that Spaid evidenced by
his manner that he was considerably bored by the
interview and looked upon Duffey as an unwelcome
intruder and that the plaintiffs were indifferent as to
what Duffey might do or leave undone about the

matter; that he (Duffey) did not promise to let Spaid hear anything further from him about the matter; and that Spaid, by his attitude and what he said, clearly indicated that he did not care or expect to hear anything further from Duffey. That in one of the intervals when Spaid was giving his attention to something else, he (Duffey) phoned to the bank and stopped the payment of the check which he had given Sprague (which will also be hereinafter more particularly mentioned).

Just here is the only conflict of evidence in the case which is of any importance. Spaid's testimony is to the effect that after Duffey had phoned to the bank stopping payment of the check given Sprague, Duffey said, as the last thing before he left, that he would go and talk the matter over with the cashier of the bank and "let me know," or "let us know," as the witness expresses it at different times in his testimony. The witness does not explain just what Duffey said he would let the plaintiffs "know," nor just what the witness expected in this particular.

The uncontroverted fact is that Duffey did not have any further communication with the plaintiffs before this action was brought.

The other circumstances bearing on the question of the liability of the defendant Duffey, about which, however, there is no conflict in the evidence, may be stated as follows:

Prior to his going abroad in service in the recent world war, Capt. Duffey, being a lawyer, had been counsel for and had represented a Mr. Sprague, who was president of an industrial corporation of Washington city and Sprague was considerably in Capt. Duffey's debt for professional services rendered the former by the latter. Capt. Duffey was discharged

from service in September, 1919, and came home. Shortly after Capt. Duffey's return from abroad Sprague came to his office and wanted him to do some professional work. Duffey declined to represent Sprague any further until he had made some arrangements to satisfy the aforesaid indebtedness, which amounted to between eight hundred and a thousand dollars, as Capt. Duffey testified. Thereupon, Sprague placed the aforesaid Ventura Oil Development Company certificate of stock in Duffey's hands to sell with the mutual understanding and agreement between them that in the event of sale Duffey was to receive half of the proceeds of sale, in satisfaction in full of the aforesaid indebtedness, and Sprague was to receive the other half. That thereafter Duffey rendered other professional services for Sprague for which the latter paid Duffey.

That the same afternoon on which the stock was thus placed in his hands, Duffey placed the stock in the hands of the bank for sale.

Accordingly, when the bank notified Duffey on December 13th that the stock had been sold and that his account was being credited by the $1,609.80 proceeds of sale, he, on the same day, wrote Sprague, giving Sprague an acquittance in full of said indebtedness, and inclosing to him a check on the bank for $804.90, Sprague's one-half of said proceeds of sale; and also drew and sent out to other persons checks on the bank, of what precise amount in the aggregate the evidence does not disclose.

When payment of the Sprague check was stopped, as aforesaid, Sprague was notified and came the next day to see Duffey, who explained the circumstances to Sprague and declined to pay the latter the $804.90, unless compelled to do so by law. Sprague, thereafter,

on December 31, 1919, instituted action on the check against Duffey (making the bank also a party to the proceeding), to recover the amount of said check, to-wit, the said $804.90, with interest from December 13, 1919. In such action Duffey made no affidavit putting the plaintiff, Sprague, to proof of his claim, but on the hearing Duffey appeared and stated the facts to the court, whereupon judgment was entered, on January 12, 1920, in favor of Sprague against Duffey, for the sum sued for and interest as aforesaid, and Duffey, on January 13, 1920, paid the amount of the judgment to Sprague's attorney.

Meanwhile, as the plaintiff, Spaid, testified, he was informed by another person, shortly after the Duffey interview aforesaid, of December 18th, that Duffey's check to Sprague had been returned to Sprague unpaid; that about two weeks after December 18th, witness was thinking about the matter and called up the cashier of the defendant bank or some other officer of the bank, on the phone, and asked what had been done about it, and was told that "some suit had been brought about the matter," and that thereupon the plaintiffs placed the case in the hands of their attorneys.

It further appeared in evidence that the plaintiffs did not institute any proceeding seeking to attach the portion of money in the hands of Duffey covered by the Sprague check before Sprague recovered the judgment and Duffey paid him the $804.90, as aforesaid; also that the plaintiffs have never made any demand upon Sprague for such portion of the money; and also that the bank did not institute any inter-pleader proceeding following the notice given it by the plaintiffs of the mistake aforesaid, but took and relied upon the position that it had parted with the control of the money before receiving such notice.

It also appeared in evidence that, including the said deposit to his credit of the $1,609.80, Duffey's credit balance on his checking account with the bank was $1,824.40 on December 13th. That the 14th was Sunday, on which the same balance was carried over. That this balance on the 15th was $1,773.40; on the 16th to 18th, inclusive, $1,696.50, and on the 19th $1,609.45.

It also appeared, in evidence, that upon further negotiation by the plaintiffs, it was ascertained that the stock which the bank sent to the plaintiffs for sale was in fact worthless at the time; but that neither the bank nor Duffey knew this until that fact was ascertained by the plaintiffs; and that the stock was placed with the bank by Duffey and by the bank with the plaintiffs, for sale, in good faith.

The plaintiffs mailed the stock to the bank in April, 1920, whereupon the bank promptly returned it to the plaintiffs, who in July, 1920, instituted this action.

*C. E. Nicol*, for the plaintiff in error.

*James R. Caton* and *Gardner L. Boothe*, for the defendants in error.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court:

The questions raised by the assignments of error will be dealt with in their order as stated below.

[1] 1. Were the plaintiffs, under the circumstances, entitled to recover from the bank the money paid to it under the mistake of fact above set forth?

The question must be answered in the negative.

[2, 3] The principle upon which a right of recovery

is based, in the case of money paid by mistake of fact, is well settled. The right of recovery, where it exists, is based upon the promise to return the money which the law implies, irrespective of any actual promise, and even against the refusal to make it, whenever the circumstances are such that *ex aequo et bono* the money should be paid back, but in such case only. *Norfolk* v. *Norfolk County*, 120 Va. 356, 91 S. E. 820; *Lawson's Ex'r* v. *Lawson*, 16 Gratt. (57 Va.) 230, 80 Am. Dec. 702; *Rinehart* v. *Pirkey*, 126 Va. 346, 101 S. E. 353; 2 R. C. L. sec. 38, pp. 784–5, sec. 8, pp. 749–750; 6 Idem. sec. 7, pp. 588–9; *Moses* v. *Macfarlen*, 2 Burrows, 1012; 3 Pomeroy's Eq. Jur. (3rd ed.), sec. 1238; *Bend* v. *Hoyt*, 13 Pet. 263, 10 L. Ed. 154. Accordingly, it is well settled that money paid under a mistake of fact cannot be recovered back where the payment has caused such a change in the position of the payee that it would be unjust to require him to refund. 21 R. C. L., sec. 201, p. 170; 2 Elliott on Contracts, sec. 1390; *Grand Lodge, etc.*, v. *Towne*, 136 Minn. 72, 161 N. W. 403, L. R. A. 1917E, 344, and note pp. 353 *et seq.*; *Walker* v. *Conant*, 65 Mich. 194, 31 N. W. 786.

As said in 21 R. C. L., sec. 201, p. 170: "The rule that money paid under a mistake of fact may be recovered back does not apply where the payment has caused such a change in the position of the other party that it would be unjust to require him to refund." —Citing numerous American and English cases. To the same effect is section 1390 of Elliott on Contracts.

In *Grand Lodge, etc.*, v. *Towne, supra*, this is held: "In an action to recover for money had and received under a mutual mistake, defendant is not liable where he has irrevocably altered his position to his loss in reliance upon the payment."

[4] In the instant case the defendant bank was entirely without fault in bringing about the mistake. The mistake was made by an employee of either one or the other of two agents of the plaintiffs, for whose selection the bank was in no way responsible, and it must, therefore, be regarded as a mistake wholly made by the plaintiffs, in so far as this action is concerned. The bank, upon receipt of the payment and in reliance thereon, before it had any notice of the mistake, placed the money to the credit of the checking account of Duffey with the bank, and so notified the latter. Thereupon, the relationship between the bank and Duffey was changed—from that in which the bank was a mere agent for Duffey to sell and collect the proceeds of the stock—into that of general depositor on the part of Duffey and debtor on the part of the bank, from which resulted the unconditional right of Duffey to check upon the deposit. 3 Am. & Eng. Enc. of Law (2nd ed.), 826, citing numerous cases and among them *Robinson* v. *Gardiner*, 18 Gratt. (59 Va.), 509. Such being the case, the bank had no right to thereafter charge back the amount of the deposit against the account of Duffey without his consent, upon any happening whatsoever. It had become the unconditional debtor of Duffey to the amount of the deposit. It could not thereafter impose any condition upon that relationship. It was just as if Duffey had deposited the money in the bank derived from some source with which the bank had no connection. It was not the case of a deposit of commercial paper made and received as a deposit under a special arrangement, express or implied, from the usual course of dealing between the depositor and the bank, or otherwise, by which the depositor had merely a conditional right to check upon the amount of the deposit, subject to the

right of the bank subsequently to charge back to the account the amount of the deposit, should the bank fail to realize upon the paper. See cases of that character referred to in *Bank* v. *Bragg*, 127 Va. 47, 102 S. E. 649, 11 A. L. R. 1034.

There are many cases and authorities which deal with the effect of the negligence of the payor plaintiff (by reason of which the mistake is occasioned), upon the right of recovery back of money paid under a mistake of fact, where the payee defendant is free from fault, or is less in fault than the payor; but as there is present in the case in judgment the element of the change of *status quo ante* aforesaid, which, certainly where the payee is wholly without fault, of itself renders it unjust that he should be required to refund to the payor, we have not entered upon any specific consideration of the cases and authorities concerning the comparative degrees of the negligence of the plaintiff and the defendant or the effect of the negligence in such cases.

[5] It is argued in behalf of the plaintiffs that the bank, upon receiving notice that payment had been made under the mistake of fact aforesaid, at the least owed to the plaintiffs the duty of instituting an interpleader proceeding, convening the plaintiffs, Duffey and Sprague, before the court, and thus having the rights of all parties determined while the money was yet in the hands of the bank. The answer to this, however, is obvious. The bank would have owed such duty only had it had control of the money at the time it received such notice. As we have seen, it then no longer had such control. It had prior to that time become the debtor of Duffey for the money, and as much so as if Duffey had obtained it from some source with which the bank had no connection and of which it had had no information.

2. Were the plaintiffs, under the circumstances, as the jury were warranted in finding, and as, therefore, we must find them, entitled to recover from Duffey the money which, in effect, came into his hands as a result of the payment of it to his agent, the bank, by the plaintiffs, under the mistake of fact aforesaid, or any part thereof?

This question must also be answered in the negative.

The principle and the considerations affecting the right of the plaintiffs to recover of Duffey are, manifestly, in general the same as those above considered as affecting the right of recovery of the bank; and there was the same entire absence of fault on the part of Duffey, as there was on the part of the bank, in bringing about the mistake; and also an absence of all responsibility for the employment of those, one or the other of whom made the mistake; so that the mistake, in so far as Duffey is concerned also, must be regarded as a mistake wholly made by the plaintiffs. Further: And since in the case of Duffey also, we find the presence, as claimed, of the element of change of *status quo ante*, which, if true, must have the same effect upon his liability as upon that of the bank, we shall, upon the question now before us, confine ourselves to the consideration of whether there was sufficient evidence before the jury to warrant their finding that there was such change of *status*, and, if so, whether there was evidence before the jury from which they could properly reach the conclusion that Duffey, in equity and good conscience, did nothing which forfeited his right to rely upon such change of position.

[6, 7] That Duffey, on receipt of information from the bank, on December 13th, that the money was paid to the bank and had been deposited to his credit (which was three days before he had any notice of

the mistake aforesaid), drew and sent his check upon the bank to Sprague for one-half of the money in question, which belonged to Sprague, was shown by the evidence without controversy.   This was a change of position on the part of Duffey, caused by the payment to the bank, which, certainly in view of the subsequent actual enforced payment of the money by Duffey to Sprague under the judgment therefor obtained by the latter, plainly made it unjust that he should be required to refund that portion of the money to the plaintiffs; unless it appears from the evidence that Duffey, by his conduct, caused the plaintiffs to lose some remedy of theirs against Sprague, or the bank.   As bearing on this single point, there is conflict in the evidence as to the conduct of Duffey in one particular.   The testimony for the plaintiffs is to the effect that after Duffey had phoned to the bank, stopping the payment of the check to Sprague, Duffey stated to one of the plaintiffs that he (Duffey) would have a talk with the cashier of the bank and let the plaintiffs "know" something further about the matter,— just what he was to let the plaintiffs "know" is not disclosed by the evidence.   Duffey, in his testimony, denied that he made any such promise.   Now, in the first place, that conflict in the evidence presented a question of credibility of the witnesses, which the verdict concluded in favor of Duffey.   Secondly: There is no evidence for the plaintiffs showing that they relied upon such a promise on the part of Duffey to their detriment in any way.   Certainly the plaintiffs did not lose any remedy against the bank, or Sprague, by reason of reliance upon such a promise, because one of the plaintiffs, Mr. Spaid, testified that about two weeks after he claimed that this promise was made, he inquired of the bank what further had

been done about the matter, and was given actual or
constructive notice from the bank of how the matter
then stood—at which time the matter stood precisely
as it did at the time the alleged promise aforesaid
was claimed to have been made by Duffey, in so far as
the remedies of the plaintiffs are concerned.   That is
to say, at both of such times the position of the bank
was such that there was no liability upon it, and
Duffey had not paid any money to Sprague.   And,
as appears from Mr. Spaid's testimony, the plaintiffs
did not, after such notice from the bank, rely upon
any alleged promise of Duffey, but immediately
placed the matter in the hands of their attorneys.
The plaintiffs had every remedy, at the latter time,
against the bank, against Sprague, and against Duffey,
that they had at the time of the alleged promise on
the part of Duffey to inform the plaintiffs further
about the matter.   And so far as losing any remedy
against Sprague is concerned, the plaintiffs, as the
evidence showed, never even made any demand upon
Sprague for any part of the money.

[8] The sole remaining enquiry is, whether the appli-
cation by Duffey, of the other half of the money in
question, to the satisfaction of Sprague's indebtedness
to him, and his acquittance of Sprague of such indebt-
edness, in pursuance of their prior mutual under-
standing and agreement to that effect (which applica-
tion and acquittance occurred upon Duffey's receipt
of notice from the bank that the payment of the money
into bank had been made, as aforesaid), constituted
such a change of position on the part of Duffey, with
respect to such half of the money, that it would, in
equity and good conscience, be unjust to require
Duffey to refund such money to the plaintiffs?   This
was unquestionably so, if, by such application and

acquittance, Duffey released Sprague from the obligation of his indebtedness aforesaid, and if such obligation, if it had not been released, would have been worth anything, however little, to Duffey. Now it is elementary that this transaction did release Sprague from such obligation, if it amounted to an accord and satisfaction; and, in view of the evidence in the case showing the position Sprague occupied in business some two years before and that Duffey had recently rendered professional services for him for which Sprague had paid the fees, the jury were warranted in finding, and, hence, we must find, that the obligation of said indebtedness would have been worth something to Duffey, if it had not been released. Our concluding enquiry is, therefore, reduced to this question: Did the transaction under consideration amount to an accord and satisfaction in contemplation of law? We think that it did.

[9] As disclosed by the evidence it would seem that, more probably, the claim of Duffey against Sprague, was not a definitely ascertained amount—was not evidenced by an obligation for a definite sum—but was merely the reasonable value of certain professional services rendered by Duffey at the instance and request of Sprague; that is to say, it was an unliquidated demand. If that was so, the agreement between Sprague and Duffey, fixing its amount, as between eight hundred and a thousand dollars, constituted an accord. And, in such case, the application by Duffey of the one-half of the money in question to the satisfaction in full of the indebtedness and his complete acquittance of Sprague from the obligation thereof, in pursuance of the prior agreement authorizing him so to do, while that agreement still existed, executed the accord; so that, at common law, the

accord and satisfaction became complete.  But even if the indebtedness was a liquidated demand, the aforesaid application of the money was an express acceptance thereof by the creditor in full satisfaction of the debt, in pursuance of the agreement aforesaid; so that, under the statute (Code sec. 5765), the same result followed.  The accord and satisfaction having thus become complete, it could not have been rescinded by Duffey alone, without the consent of Sprague.  It, therefore, extinguished and operated as a final bar to the obligation of said indebtedness, either at common law (R. C. L., Article "Accord and Satisfaction," sections 1, 30, 35, 38), or under the statute (Code, sec. 5765).

The case will be affirmed.

*Affirmed.*