## W. E. RICHMOND & CO. v. SECURITY NAT. BANK.

Western Section. April 28, 1933.

Petition for Certiorari denied by Supreme Court, June 24, 1933.

Pearson & Hewgley, of Jackson, for appellant.
W. G. Timberlake, of Jackson, for appellee.

ANDERSON, J. This suit was instituted in the chancery court of Madison county, Tennessee, by the complainants, W. E. Richmond, L. E. Richmond, and W. R. Copeland, doing business as stockbrokers in Memphis and Jackson under the firm name and style of W. E. Richmond & Co. against the defendant, Security National Bank, a national banking corporation located in Jackson, seeking to recover the net sum of $509.50, representing the net amount claimed from a sum of $531.70, alleged to have been paid by the complainants to the defendant on June 4, 1930, by mistake. The chancellor awarded the complainant firm a decree for $260 and interest from the 1st day of August, 1930. The defendant prayed and was granted a broad appeal and both complainants and defendant by appropriate assignments of error attack the decree of the chancellor as to the matters decided adversely to their respective contentions.

The controversy between the parties arose out of the attempted sale by the defendant through the complainants as stockbrokers of twenty shares of stock of a Delaware corporation, the corporate name of which was the Fair Stores Company. This stock was held by the defendant bank as collateral for an indebtedness evidenced by a note in the principal sum of $240 due it by one Emanuel Fishman. The indebtedness being several months past due and having received the debtor's consent so to do, the cashier of the defendant undertook to sell the stock with the intention of applying the proceeds to the debt. For this purpose he called the Jackson office of the complainant firm on June 2, 1930, by telephone and directed the complainant's representative to sell twenty shares of the Fair Stores Company at the market price. This order was taken by the telegraph operator in the complainant's Jackson office, the manager being absent at the time.

No stock of a corporation by the name of Fair Stores Company was listed on the New York Exchange, the quotations of which exchange were carried in the complainant's Jackson office, but there was a stock listed on said exchange under the name of the Fair. The latter was an Illinois corporation owning and operating one of the largest department stores in the city of Chicago, and employing an

average in excess of 3,000 people. Its stock had long been listed on the New York Stock Exchange and was the subject of considerable barter and sale among those there trading in corporate stocks.

The Fair Stores Company was a Delaware corporation having no connection whatever with the Illinois corporation doing business under the corporate name of the Fair. By comparison the former was a small organization. Its stock was not listed or dealt in on the New York Stock Exchange. It was dealt in, however, on the local security market in Nashville and quotations of the transactions shown by the Commercial Appeal on June 2, 1930, covering dealings on the local security market showed that the stock of the Fair Stores Company was on that day offered for sale at $11 and that $8 was bid therefor.

Having no knowledge or record of the existence of any such company as the Fair Stores Company, the complainant's representative, who took over the phone the order for the sale of the stock from the defendant's cashier, understood or assumed that the stock intended to be sold was that of the Fair. Nothing said by defendant's representative warranted this assumption. Upon receipt of the order, the operator immediately telegraphed the complainant's New York correspondent, Post and Flag, an order to sell at the market twenty shares of the Fair. Due to the fact that the order was for the sale of less than 100 shares, the complainant's correspondent was unable to effect a sale on June 2, the day on which the order was given, prior to the closing of business on the exchange on that day. Upon being advised of this fact, the complainant was directed by the defendant to execute the order on the next day. Thereupon Post and Flag, acting as the representatives of the complainant, sold on June 3, 1930, twenty shares of the Fair at $26\frac{7}{8}$, realizing a gross amount of $537.50. From this amount taxes of eighty cents and commission of $5, were deducted, leaving a net amount arising from the sale of $531.70.

The complainant on the same day advised defendant of the result of the sale by a telephone communication from the Jackson office and also by mail from the Memphis office. The substance of the advice and notice was to the effect that the complainant had sold for the account of the defendant twenty shares of the Fair at $26\frac{7}{8}$ realizing the net amount above indicated after deduction of taxes and commission. Thereupon the defendant drew its draft on complainants at Memphis, Tennessee, for $531.70, attaching thereto the certificate for twenty shares of stock of the Fair Stores Company which had been issued to Emanuel Fishman and which the defendant held as collateral, securing the indebtedness of said Fishman to it. The certificate bore a blank form for its assignment and transfer, which had been signed by Fishman and the genuineness of his signature thereon was guaranteed by the bank as evidenced by an endorsement on the certificate signed by the defendant by its assistant cashier.

The draft was presented to and paid by complainants in Memphis under the belief that the certificate attached thereto represented the twenty shares of stock in the Fair which its New York representatives had sold on the day before, pursuant to complainant's order above referred to. The complainant's Jackson representatives never saw the certificate of stock or the draft.

The defendant was advised on June 5th by its Memphis correspondent that the draft drawn by it on the complainants had been paid and the proceeds credited to the defendant's account. Thereupon the defendant charged the amount of the draft to its Memphis correspondent and passed a credit through its books indicating that the Fishman note had been paid and at the same time issued its cashier's check in the sum of $271.70, representing the difference between the amount of Fishman's debt and the proceeds of the draft referred to. This check was not, however, delivered to Fishman at that time but was held by the defendant until July 13th or 14th, on one or the other of which dates it was delivered to Fishman and paid by the defendant upon his indorsement.

In the meantime, in the regular course of business, the complainant had forwarded to its New York representatives, Post and Flag, who had executed the order of sale on June 3d, the certificate of stock it had received from the defendant upon payment of the latter's draft. It seems that the complainant carried an open account with Post and Flag, and, in the regular course of business between these two firms, kept on deposit as collateral with them stocks of various kinds and descriptions. This collateral was from time to time replenished or sold as the necessity of the business demanded. The certificate for twenty shares of the Fair Stores Company was sent along with a number of other certificates of stock having no connection with the transaction here involved.

When the sale of twenty shares of the Fair was made by Post and Flag on June 3d, that firm thereupon and thereafter carried the complainants as short in that stock to the extent of twenty shares. When the stock of the Fair Stores Company was received, not having had an order to sell and not having sold any stock of this company, Post and Flag apparently assumed that it had been sent by complainants along with other stocks which accompanied it, to be held as collateral for the complainant's account; and it accordingly carried the complainant's account as being long to the extent of twenty shares of stock in the Fair Stores Company pending further instructions from the complainant as to the disposition to be made of the stock. It appears that according to the custom of this character of business that when a dividend is declared on stock held by a broker, he verifies his record for the purpose of ascertaining the identity of the customer entitled to the individual. A dividend was declared on

the stock of the Fair some time in July, and, upon investigating its records for the purpose above mentioned, Post and Flag discovered that the complainants were short twenty. shares of this stock and wired the complainants to this effect. The records of the complainants in Memphis with respect to the transactions were balanced and upon receipt of this advice from Post and Flag they checked the items back and discovered·the mistake in the identity of the stock which they had ordered Post and Flag to sell and that which they had received from the defendant bank. The complainant thereupon promptly notified the defendant bank through its Jackson office, which notice was confirmed by a letter dated July 21, 1931, advising defendant of the mistake and that on account thereof the defendant's account was short twenty shares of stock in the Fair and that complainant held the twenty shares of stock in the Fair Stock Company subject to the defendant's instructions and requesting that the complainants be notified quickly as to how the defendant wished the matter handled. When this information was received, the defendant's cashier who handled the matter was absent on a vacation and the complainants were advised by another representative of the defendant that the matter would have to await the return of the cashier.

The defendant having failed or declined to give any instructions with respect to what disposition should be made of the matter, the complainants were forced to purchase on the New York Exchange a sufficient number of shares of the Fair to offset the sale of that stock made by its New York correspondent on June 3d. This purchase was made at 24⅝, the net cost being $497.50, resulting in a profit of $34.20, the dividend of $12 which had been declared in July on the Fair stock and which was due the purchaser of that stock was deducted, leaving a net amount of $22.20 which was credited by the complainant to the defendant's account.

Thereupon complainants on August 1, 1930, drew their draft on the defendant for the debt that was outstanding, attached thereto the certificate for twenty shares of stock in the Fair Stores Company, which draft the defendant declined to pay. After negotiations to adjust the matter had failed, the complainants instituted this suit on the theory that having paid defendant's draft under a mistake of fact as to the identity of the certificate of stock thereto attached, they were entitled to recover the amount so paid the defendant, notwithstanding the error of their employee in taking the order of sale from the defendant's cashier.

The defense relied upon by the defendant in its answer is in substance and effect that in drawing its draft on the complainants and in receiving payment thereto and in applying the proceeds to the debt of Fishman and in remitting the balance to him, it acted in

good faith without fault on its part, under the well founded belief that complainants had executed the order of sale that it had been given and that it was without knowledge of any mistake or error in the execution of said order or in the payment of said draft. That it believed and had a right to believe that the amount received by it in payment of said draft represented the proceeds realized from the sale of the stock which it had ordered sold and that it had no cause to believe otherwise. That complainant failed to exercise reasonable diligence in discovering the error and notifying defendant thereof before it had acted, and in time for it to have protected itself. That by the acts and conduct of complainant in the premises it has been induced to change its position to its detriment and to the extent that if required to refund the amount received by it to complainant, it would be left in a worse position than it would have been had no payment been made at all. That though the draft may have been paid through mistake, the complainants are estopped by their own acts and conducts in the premises to hold the defendant responsible for any loss sustained by them in the transaction.

The chancellor found that the payment of the draft had been made by complainants under a mutual mistake of fact in that complainants erroneously assumed at the time that the stock accompanying the draft represented the stock they had sold on the previous day on the New York Exchange and in that defendant erroneously believed that the stock so sold by complainants on the day before was the same stock that it had instructed complainant's Jackson representative to sell its account, but that having paid to Fishman the surplus of the proceeds of the draft over and above his debt to it before it was notified of the mistake, and thus injuriously changing its position as to this amount, the defendant should not be held liable for said sum. He accordingly limited complainant's recovery to the difference between the amount paid Fishman by defendant and the amount of the draft, less the credit of $22 representing the net profit resulting from the sale and purchase by the complainant of the twenty shares of stock in the Fair and directed the return to the defendant of the certificate for twenty shares of stock in the Fair Stores Company which was tendered with the bill.

By its first assignment of error the defendant insists that the chancellor erred in holding that the draft in controversy was paid through a mutual mistake of fact; and it is contended in this connection that the uncontradicted proof shows that the complainant's representative knowingly directed the sale of a stock which the defendant had not ordered sold and that the complainant thereafter paid said draft with the stock attached thereto which the defendant had ordered sold. That there was no mistake, but, on the other hand, the complainant

through its representative knowingly changed the defendant's order to sell the stock.

In support of this assignment, while conceding that the general rule is that where money is paid by a mistake of fact, although there was negligence on the part of the person making the payment, it may be recovered, yet it is insisted that where the mistake is due to willful or intentional neglect on the part of the person making the payment to investigate the facts, he should not be allowed to recover the money paid. Under such circumstances it is insisted the payor would be estopped to allege that he was without knowledge.

In support of this contention the case of Bend v. Hoyt, 13 Pet., 263, 10 L. Ed., 154, and Scott v. Ford, 45 Or., 531, 78 P., 742, 80 P., 899, 68 L. R. A., 469, are cited. In the course of the opinion delivered on behalf of the majority of the court in the case of Bend v. Hoyt, referred to, it is said that:

"Even courts of equity will not interfere to assist a party to obtain redress for an injury which, he might, by ordinary diligence, have avoided; and, a fortiori, a court of law ought not, when the other party has, by his very acts and omissions, lost his own proper rights and advantages."

This case was decided in 1839. There was a dissenting opinion by Mr. Justice Thompson.

Referring to this rule, in 21 R. C. L., 168, section 198, it is said:

"The rule which formerly prevailed that if a person might, by the exercise of reasonable diligence, have ascertained the facts, he would not on the ground of ignorance or mistake be permitted to recover money paid has of late been much relaxed. The later cases establish the doctrine that it is not sufficient to preclude a person from recovering money paid by him under a mistake of fact that he had the means of knowledge of the fact."

The cases of Bend v. Hoyt and Scott v. Ford, supra, relied upon by the defendant in this case are cited in the above authority as illustrating the rule which formerly prevailed on this subject. Abundant authority is cited to support the rule established by the latter cases.

The rule referred to, as it formerly prevailed, was never followed in Tennessee so far as we have been able to find. The Supreme Court had the question under consideration in the case of Guild v. Baldridge, 32 Tenn. (2 Swan), 295. After reviewing the authorities, the court announced the rule to be:

"The foregoing authorities clearly establish, that to preclude a party from recovering back money paid by him, which he was neither legally nor morally bound to pay, upon the ground that the payment was made with knowledge of the facts, it must appear that actual knowledge of the facts existed in his mind at the time of such pay-

ment. The party to whom the payment was made, and who, in good conscience, has no right to retain it, cannot resist a recovery upon the ground of the plaintiff's negligence in availing himself of the means of knowledge within his reach.

"The right of recovery proceeds upon the ground, that the plaintiff has paid money which he was under no obligation to pay and which the party to whom it was paid had no right either to receive or to retain, and which, had the true state of the facts been present in his mind, at the time, he would not have paid.

"It is wholly immaterial, therefore, to what cause the mistake may be attributable. No sound discrimination can be made between the case of a plaintiff who is induced to part with his money, because he never, in fact, was possessed of knowledge of the facts that would have hindered him from doing so, and the case of him, who having once possessed such knowledge, is, at the time of parting with his money, laboring under an oblivion of memory in respect thereto. Forgetfulness of a material fact may, therefore, be said to be ignorance of such fact."

It is thus seen that ordinary negligence in failing to ascertain the facts is not alone sufficient to bar a recovery in cases of money paid under a mistake of fact.

It is insisted, however, that where the mistake is due to willful or intentional neglect on the part of the person making the payment to investigate the facts, he should not be allowed to recover the money paid; that under such circumstances he would be estopped to allege that he was without knowledge. This is a correct proposition of law but we do not think the facts disclosed by the record call for its application in this case.

It is true that the telegraph operator in the complainant's Jackson office testified, in substance, that the defendant's cashier directed him to sell twenty shares of stock in the Fair Stores Company, but he also says, in substance and effect, that having no record or knowledge of the existence of such a corporation and there being no quotations of that stock in the reports received in his office from the New York Stock Exchange, he understood that the order referred to stock in the Fair, which was regularly dealt in on the exchange. He undoubtedly made an error in this respect for which the defendant was in nowise responsible, but there is nothing to indicate that his action was willful or intentional.

However, the mistake of the operator is not the mistake made the basis of the recovery sought by the complainants and awarded by the chancellor. The mistake under which the money was paid was that of the complainant's bookkeeper in Memphis in paying the defendant's draft under the belief that the stock certificate thereto attached represented shares of stock in the Fair, whereas it in fact rep-

resented stock in the Fair Stores Company. There is no dispute on the point that the bookkeeper made the mistake referred to. He so testified and there is no evidence to the contrary. All of the circumstances surrounding the transaction bear out his testimony. When the operator in the Jackson office wired the complainant's New York representative to sell twenty shares of stock in the Fair, the wire was copied by the operator in the complainant's Memphis office. The bookkeeper made the entry in his record covering the transaction from the copy of this wire which directed the sale of twenty shares of stock in the Fair and not twenty shares of stock in the Fair Stores Company. There is nothing to indicate that the bookkeeper or any one else in the Memphis office had any knowledge of the fact that the defendant's cashier had instructed the operator in the complainant's Jackson office to sell twenty shares of stock in the Fair Stores Company and not twenty shares of stock in the Fair. On June 3d the defendant was notified by the complainants that they had sold on that day for the defendant's account twenty shares of stock in the Fair. This notice was prepared and mailed from the Memphis office by the bookkeeper who afterwards paid the draft. It shows the amount realized from the sale to have been $531.70 and that this amount was realized from the sale of twenty shares of stock in the Fair. On the day this statement was mailed the defendant drew its draft for the identical amount of $531.70, indicated on the statement sent it and attached to said draft a certificate for twenty shares of stock in the Fair Stores Company. This certificate was not exhibited to or seen by any of the complainants' representatives connected with their Jackson office.

Under these circumstances it is not difficult to see how the bookkeeper would have paid the draft without discovering the fact that the wrong stock was attached thereto especially since he was fully aware of the fact that he was dealing with a reputable institution.

It is also contended that the complainants were negligent in failing to discover the error made in connection with the sale of the stock in a reasonable time thereafter and in failing to notify the defendant thereof before it had parted with the proceeds of the draft. In view of the nature and custom of the business in which the parties were engaged, we do not think that this contention can be sustained. In the regular course of dealing between the complainants and their New York representatives, the complainants carried with the latter an open account secured by collateral deposited with the correspondent, which collateral was from time to time replenished as the necessity of the business demanded. Stocks to be used for collateral were sent along from time to time together with stock to be delivered upon contracts of sale previously executed. At the time they received from the complainants the certificate for twenty shares of stock in the Fair

Stores Company, the New York correspondent had not had or executed an order to sell any stock of this company. However, in view of the custom attending their dealing with the complainants, the New York correspondent had no reason to assume when the stock in that company was received that it was necessarily sent to·cover a previous order to sell that stock, for, as stated, the complainant was frequently sending stock to its correspondent to be held as collateral in its account subject to further instructions and it was but natural for the latter, not having received an order to sell any stock in the Fair Stores Company, to assume that the certificate sent along with certificates of stock in several other companies was intended as collateral rather than for delivery on a previous order of sale. The stock in question was accompanied by certificates of several other stocks in different concerns without anything to indicate that it had any connection with the order previously given by the complainants to sell twenty shares of stock in the Fair.

When the error was discovered in the manner hereinabove indicated, the defendant was promptly notified of the facts by a telephone communication from the complainants' Jackson office which notice was confirmed by a letter from the Memphis office, dated July 21, 1930. Under these circumstances we do not think that the complainant was guilty of any negligence of a nature that would in and of itself preclude its right to a recovery on the ground of a mistake made in the payment of the defendant's draft. The first assignment of error is accordingly overruled.

By the second assignment of error it is insisted that the chancellor erred in holding that the defendant had not injuriously changed its position as to that part of the proceeds of the draft which was applied to the payment of Fishman's debt and in holding the defendant liable for any part of the proceeds of said draft. In support of this assignment it is contended that the undisputed proof shows that Fishman had no property subject to execution and that the defendant had canceled and delivered to Fishman his note evidencing the debt due the bank and lost its opportunity to sell the collateral which it had ordered complainant to sell and that it cannot now recover from Fishman the amount paid him from the proceeds of the draft, and it cannot sell the stock tendered it by the complainant.

We cannot agree to this contention. There is nothing in the record to show that the twenty shares of Fair Stores Company stock cannot now be as well sold as it could at the time the order for the sale thereof was given to the complainant. Nor does it satisfactorily appear from the proof that the complainant has either canceled Fishman's debt or marked his note paid. Defendant's cashier testifies that upon receipt of the proceeds of the draft an entry was made on the books of the defendant indicating that the Fishman note was paid,

but he further testifies that he does not remember whether the note had been marked paid or not at the time he was testifying. He also testified that after the mistake had been discovered that he and one of the complainants conferred with Fishman about the matter and that Fishman said that he was willing to do anything he could but he was not able then to pay the obligation and did not know when he could do so. Fishman evidently does not contend that the debt has been canceled and there is no evidence in the record to the effect that the defendant bank considers it canceled.

Under the circumstances, the mere crediting of the proceeds of the draft on the debt of Fishman does not constitute a payment of the debt nor is it such a change of the defendant's position in regard thereto as will preclude a recovery under the rule allowing the recovery of money paid under a mistake of fact. Deisch v. Wooten-Agee Co., 95 Ark., 279, 129 S. W., 819; Merchants' Bank v. Marine Bank, 3 Gill (Md.), 96, 43 Am. Dec., 300; U. S. Nat'l Bank v. Union Nat'l Bank, 268 Pa., 147, 110 A., 792.

Again we do not think that the debt of Fishman to the bank could have been extinguished by the application thereto of funds which admittedly did not either belong to Fishman or represent the proceeds of the stock held by the defendant as collateral to his debt. The fact that nothing can be made out of Fishman by means of an execution, if that fact was satisfactorily shown by the record, does not help defendant's position in this respect; for so far as the record shows he was in the same financial condition at the time the complainant offered to return the stock as he was at the time the order for the sale of the stock was given. Complainant tendered with the bill the twenty shares of stock in the Fair Stores Company to the defendant and the chancellor ordered said stock to be turned over to the defendant and delivered to the defendant. So far as it appears from the record there has been no change in its value and so far as Fishman's debt is concerned the defendant is no worse off than he was before the mistake was made.

The second assignment of error is therefore overruled.

The action of the chancellor in overruling the defendant's exception to the introduction of the written notice alleged to have been sent the defendant by the complainants advising of the sale for the defendant's account for twenty shares of stock in the Fair is made the basis of an assignment of error on behalf of the defendant. In support of this assignment it is insisted that it is not shown that this notice was delivered to the defendant and that no facts are shown justifying the presumption of a delivery and hence the defendant is not chargeable with knowledge of the contents thereof.

The notice referred to appears in the record as Exhibit B to the testimony of the complainant's bookkeeper, Mashburn, who says that

he prepared the notice and mailed it to the Security National Bank. He does not say that it was mailed to Jackson, Tennessee, the bank's address, or that it was properly stamped and deposited in a mail box. It does appear, however, on the face of the notice, that it was addressed to the bank at Jackson, Tennessee. It also appears without dispute that the defendant bank was located at that place, and, so far as the record discloses, it had no other address. No inquiry was made on cross-examination as to the details of how the letter was mailed. The cashier of the defendant, who was the only witness testifying in its behalf, does not deny that the notice was received by the defendant. He simply says that he does not remember whether it was received or not; that after the controversy arose he looked in the defendant's files and could not find the letter.

It likewise appears without dispute that the defendant received the complainant's letter of July 21st, notifying it of the mistake which is the subject of this suit, and it appears from the face of this letter that it was addressed to the defendant at Jackson, Tennessee, just as was the notice, the admission of which is complained of.

The general rule is that when it is shown that a letter has been deposited in the post office properly stamped and correctly addressed to the true place of residence of the person to whom it is sent, it is presumed the addressee received it in due course of the mail. This is a presumption of fact which may be rebutted. It is not overcome, however, by the testimony of an addressee that he does not remember whether or not he received the communication; or by the testimony of one officer of a corporation or firm showing that he did not receive the communication, without also showing that no one else in authority received it. McFerren v. Goldsmith-Stern Co., 137 Md., 573, 113 A., 107, 18 A. L. R., 1125; Ashley Wire Co. v. Ill. Steel Co., 164 Ill. 149, 45 N. E., 410, 56 Am. St. Rep., 187; Merchants' Exchange Co. v. Sanders, 74 Ark., 16, 184 S. W., 786, 4 Ann. Cas., 957; 21 R. C. L., 764-769; Jones on Evidence, vol. 1, section 197.

Evidence that another letter, addressed in the same manner as the letter in question, was received by the addressee, is entitled to be considered in determining whether or not the presumption will arise. Lawrence Bank v. Raney & B. Iron Co., 77 Md., 321, 26 A., 119.

The courts of some jurisdictions take the view that proof that a letter is "mailed" carries the implication that it was properly addressed. Southern Engine & Boiler Works v. Vaughan, 98 Ark., 388, 135 S. W., 913, Ann. Cas. 1912D, 1062.

Other courts hold that no such implication arises from proof of mailing and that the statement that a letter was mailed to a certain man necessarily implies only such actions as are required by the postal authorities, namely, that the letter have some address and that

it be properly stamped. Feder Silberberg Co. v. McNeil, 18 N. M., 44, 133 P., 975, 49 L. R. A. (N. S.), 458.

The argument in favor of allowing mere testimony of "mailing" to raise the presumption that the matter mailed was received is ably presented by the Wisconsin court in the case of Reeves v. Midland Casualty Co., 170 Wis., 370, 174 N. W., 475, 477, 959, in which case the court, speaking with reference to the contention that stamping, addressing, and mailing must be affirmatively shown before the presumption will arise, says:

"This contention is no doubt supported by much authority, but it seems to us that this rule is too technical to be adopted by a court as an original proposition in this day. Such a rule dignifies form rather than substance. The term 'mailing' or 'mailed' has a well-understood meaning. If it is said to a business man, 'I mailed a letter,' he assumes that the letter was inclosed in an envelope, properly addressed, deposited in the post office with the postage duly prepaid, and he will act upon that assumption in conducting the most important business transactions. When the same expression comes from the mouth of a witness in a court of justice, why should the court hesitate to accord to the expression its usual and customary significance especially in view of the fact that the opposing party has the right to cross-examine him with respect to every detail essential to constitute a complete mailing."

It has also been held that evidence that letters were "sent" in the absence of proof to the contrary or any inquiry as to the mode, raises a presumption of their receipt by the addressee. Oregon S. S. Co. v. Otis, 100 N. Y., 446, 3 N. E., 485, 53 Am. Rep., 221; Williamson v. Seeley, 22 App. Div., 389, 48 N. Y. S., 196; Cooke v. McAleena, 18 Misc., 219, 41 N. Y. S., 479.

We think under all other circumstances shown in connection therewith that there was no error in the action of the chancellor in overruling the defendant's exception to the introduction of this notice.

The errors assigned by the complainant remain to be disposed of.

By the first assignment it is insisted that the chancellor erred in overruling complainant's exception to the testimony of defendant's cashier to the effect that Emanuel Fishman did not own, to the knowledge of the witness, any property and that said Fishman "says he did not"; and that the witness did not know of any way that the bank could collect from Emanuel Fishman by execution or otherwise the amount of his obligation to the bank.

With the exception of that part of the testimony wherein the witness undertakes to repeat a statement made by Fishman out of the presence of the complainants, the testimony is competent. The com-

plainants were not prejudiced by the erroneous admission of the part indicated.

The second assignment of error is predicated on the finding of the chancellor that complainant's letter of July 20, 1930, filed as Exhibit 2 to the deposition of H. E. Oglesby was the first notice that the complainants gave the defendants of the fact that a mistake had occurred.

The testimony shows that the first notice of the error was given over the telephone to Mr. Hendrix, the defendant's assistant cashier by Mr. Armstrong, the manager of the complainants' office at Jackson. Armstrong testifies that this notice was given about the middle of July and that he was informed by Mr. Hendrix that the matter had been handled by Mr. Oglesby, the cashier, who was then on his vacation. Mr. Copeland, one of the complainants, testifies that the notice given through the Jackson office was confirmed by letter. Without doubt he had referred to the letter of July 21st. The notices were given promptly upon the discovery of the error by the complainants. As to this, there appears to be no dispute in the record.

The third error assigned on behalf of the complainant is predicated on the action of the chancellor in limiting the recovery awarded the complainants against the defendant to the sum of $266.33 and one-half of the costs and in failing to award to the complainant a recovery against the defendant for the full amount sued for to wit, $509.50 (the difference between the amount of the draft paid to the defendant by the complainants and the credit of $22.20 representing the net profit accruing from the sale of the twenty shares of the Fair) together with interest on said sum from August 1, 1930, the date of defendant's refusal to pay the formal demand by the complainant.

This assignment raises the most difficult question in this case. As hereinabove stated and as indicated by his decree, the chancellor was of the opinion that inasmuch as the defendant, before it was notified by the complainant that a mistake had occurred, paid to its debtor, Fishman, out of the proceeds of the draft paid to it by the complainant, the sum of $271.70, representing the balance of said proceeds over and above the amount Fishman owed the bank, that the complainant was not entitled to recover this sum. In other words, the chancellor was manifestly of the opinion that while the payment of defendant's draft by the complainant was made under a mistake of fact, yet the defendant's position had been changed with respect to that part of the proceeds of the draft which it had paid to Fishman and hence that to allow a recovery of this amount would be inequitable.

It is undoubtedly true that the general rule to the effect that money paid under a mistake of fact may be recovered back, does not apply

where the payment has caused such a change in the position of the other party that it would be unjust to require him to refund. 21 R. C. L., section 201, page 170.

In Corpus Juris, the rule is thus stated:

"In general, where a payee has changed his position to his prejudice in reliance upon the payment and cannot be placed in status quo, the payment cannot be recovered, although made under a mistake of fact caused by his own negligence or lack of diligence in taking advantage of means and knowledge available to him, there can be no recovery except when the payor's negligence was induced by negligence on the part of the payee, and except, in some jurisdictions, but not in all, where both parties are equally innocent or guilty of negligence or lack of care." 48 C. J., section 327, page 767.

We have found two cases involving controversies arising out of facts to a large extent similar to those presented in this case. We refer to the cases of Hibbs v. First National Bank, 133 Va., 94, 112 S. E., 669, 25 A. L. R., 120, and Donner, Childs & Woods v. Sackett, 251 Pa., 524, 97 A., 89.

In both of these cases actions were instituted to recover payments of money made under mistake by brokers due to their having, through error, sold an altogether different stock from that which they were ordered to sell. In each case, the error was wholly that of the broker and was due to a confusion arising out of a similarity of the names of the corporations involved and the fact that the stock ordered sold was unlisted and unknown, while that actually sold was listed and well known.

In the case first mentioned, a recovery was denied on the ground that the position of the payee had changed before notice of the mistake was received. While we are not prepared to agree altogether with the reasoning of the court in that case, the facts are distinguished from those of the present case in that there it affirmatively appeared without dispute that in ordering the stock sold, the bank acted solely as an agent of the owner of the stock and had no interest in the proceeds, and it further appeared without dispute, that at the time it credited to the account of its customer, the owner, the money alleged to have been paid by mistake, it had no notice of the error and no knowledge of any facts and circumstances reasonably calculated to put it upon inquiry with respect thereto.

In Donner, Childs & Woods v. Sackett, the other case referred to, a recovery was allowed against the owner of the stock, who, through a mistake of the broker, had received payment of the proceeds of the sale of an altogether different stock in which the defendant had no interest whatever. The suit was not directed against an agent acting for the owner of the stock. By way of defense, the defendant contended that, without notice of the mistake, he had used the proceeds

of the payment to pay some of his debts and that his position had thus been changed to the extent that it would be inequitable to require him to refund the money. The court, in allowing a recovery, very properly held that it was the duty of the defendant to pay his debts whether the stock had been sold or not and that this constituted no such change of position as would preclude a recovery.

In the case at bar, it is insisted on behalf of the complainant that the immediate parties to the transaction involved were the complainant on one hand and the defendant bank on the other; that they did not know of Fishman's debt to the bank or of his interest in the stock, but acted solely for the defendant and as its agents in the transaction. And in this connection, it is contended that as between the immediate parties to a transaction, the doctrine of irrevocable change of position involving loss to the defendant where the parties are equally innocent, constitutes no defense to an action brought to recover money paid under mistake. The proposition of law thus contended for is supported by the text of 21 R. C. L., page 1711, and by the cases of Kingston Bank v. Eltinge, 40 N. Y., 391, 100 Am. Dec., 516, and Clark v. Bradley (Tex. Civ. App.), 270 S. W., 1050.

Upon the other hand, money paid by mistake to an agent or other person acting only in a representative capacity cannot be recovered from him if he has paid it over to his principal before notice of the mistake. 48 C. J., section 328, page 768.

And the fact that the complainants in the instant case were not advised that the defendant bank was acting for Fishman would not prevent the application of this rule, unless the bank was to receive some personal benefit from the principal. 48 C. J., section 328, pages 767, 768.

Under the facts disclosed in this record, the bank was acting both for itself and Fishman in ordering the sale of the stock in question and receiving payment of the draft drawn on the complainants.

We understand it to be further contended on behalf of the complainants that before defendant paid over to Fishman the surplus of the proceeds of the draft, it either knew or had notice of the facts and circumstances from which it should have known, that a mistake had been made, and that having this notice it parted with the money paid to Fishman without making any effort to ascertain the facts, and therefore it cannot be heard to say that its position has been thereby altered to its prejudice.

As we understand it, the defendant's contention in substance and effect is that, conceding the payment of its draft to have been made under a mistake of fact, yet the defendant being itself innocent in the matter has been led by the complainants' mistake and their negligence in advising it thereof, to change its position to its damage and detriment by paying the money over to Fishman; and that there-

fore complainants are now estopped by their own conduct to hold the defendant responsible for any loss they may have sustained in the transaction. In other words, the defendant relies upon the doctrine of equitable estoppel.

The question involved in these respective contentions we consider to be decisive of the feature of the case now under consideration. In deciding it we deem proper to first examine the principles of law controlling the application of the doctrine relied upon by the defendant.

The doctrine of equitable estoppel is well established. An essential element is the entire good faith and innocence of the party imposed on. An estoppel by representation cannot be claimed by one acting thereon, if he knows of, or has been put upon inquiry as to its falsity; and where one with a convenient opportunity to ascertain the real facts by the exercise of reasonable diligence neglects to do so after having been put upon inquiry, he will not be permitted to defeat another's just rights by urging an equitable estoppel based on his having acted to his disadvantage in relying upon that other's innocently mistaken representation regarding those facts, where such representation was not made for the purpose of inducing him so to act. Eyers Woolen Co. v. Gilsum, 84 N. H., 1, 146 A., 511, 64 A. L. R., 1196; Vineland v. Fowler Waste Mfg. Co., 86 N. J. Law, 342, 90 A., 1054, L. R. A., 1915B, 711.

In 2 Pomeroy's Equitable Jurisprudence (4 Ed.), section 810, page 1662, it is said:

"The truth concerning these material facts must be unknown to the other party claiming the benefit of the estoppel, not only at the time of the conduct which amounts to a representation or concealment, but also at the time when that conduct is acted upon by him. If, at the time when he acted, such party had knowledge of the truth, or had the means by which with reasonable diligence he could acquire the knowledge so that it would be negligence on his part to remain ignorant by not using those means, he cannot claim to have been misled by relying upon the representation or concealment."

Those who proceed without ordinary care are not entitled to the benefit of an estoppel. Frankfort Land Co. v. Hughett, 137 Tenn., 32, 51, 191 S. W., 530.

In Fourth Nat. Bank v. R. R., 128 Tenn., 530, 537, 161 S. W., 1144; 1146, the law of equitable estoppel is laid down as follows:

"A party setting up an estoppel is bound to the exercise of reasonable diligence—such diligence as the circumstances of the case require. Moore v. Bowman, 47 N. H., 494. This rule is probably the foundation of the other rule that, where both parties have the same means of ascertaining the truth, there can be no estoppel. Crab-

tree v. Bank, 108 Tenn., 483, 67 S. W., 797, and Brant v. Va. Coal, etc., Co., 93 U. S., 326, 23 L. Ed., 927.

"That is to say, if a party decides upon a matter or determines his course with a careless indifference to means of information reasonably within his reach, or if he is heedless of circumstances highly suspicious and sufficient to warn him, he will not be entitled to complain and invoke estoppel.

"To hold that one, who shuts his eyes and disregards danger signals flaunted before his view, is an innocent party, entitled to invoke the doctrine of equitable estoppel, would be to encourage fraud. A person who so conducts himself scarcely acts in good faith, and it is well settled that a party must proceed in the utmost good faith to claim the benefit of an estoppel."

The foregoing principles of law we conceive to be applicable to this case. Having already found that the payment of the defendant's draft by complainants was made under a mistake of fact and that in paying the same and in failing to discover the mistake and notify the defendant thereof, that the complainants were not guilty of such negligence as would bar their right to recovery, the inquiry has been narrowed to the other question: Did the defendant, at the time it paid over to Fishman the proceeds of the draft, less his debt to it, have notice of the facts and circumstances sufficient to put it upon inquiry that the money received by it had been paid through a mistake; and, if so, did it use reasonable diligence under the circumstances in an effort to ascertain the facts about the matter before paying the money to Fishman?

If it had no such knowledge, or if having it, it exercised such diligence as was required by the existing circumstances to discover the facts and failed to do so before paying the money over to Fishman, it would be inequitable to require it to refund the money; otherwise, it must be held liable.

There is no substantial conflict in the evidence bearing on this question.

The defendant's order to sell the twenty shares of stock it held as collateral to Fishman's debt was given on June 2d. No sale was had in New York on that date and at defendant's direction the order was renewed the next day and sale then made of the twenty shares of stock in the Fair. On the same day the defendant was advised by telephone communication from the Jackson office of the complainants and also by a written notice mailed from the Memphis office on that day. This notice was to the effect that the complainants had sold for their own account, not twenty shares of the stock of the Fair Store corporation, but twenty shares of the stock of the Fair and had realized therefrom a net profit of $531.70. This sum was more than two and one-half times the value of the twenty shares of the stock in the

Fair Store Company measured by the amount asked and bid for that stock on the local security market on that day. It is true the defendant's cashier says that he does not remember getting the written notice, but it nevertheless appears that on June 3d, the defendant drew its draft on the complainants at Memphis for the identical amount indicated by the notice to have been realized from the sale of the stock. The draft was probably drawn on the strength of the telephone communication from the Jackson office of the complainants. This draft was paid to the defendant's Memphis correspondent on June 4th and the proceeds credited to the defendant's account. On June 5th the defendant received notice of the fact that the draft had been paid. It thereupon charged its Memphis correspondent with the amount of the draft and promptly passed a credit through its books for the amount of Fishman's debt to it, indicating that the same had been paid. At the same time, it executed a cashier's check payable to Fishman for the difference. Fishman was not indebted to the bank in any other or further sum and it is conceded that if the proceeds of the draft had in fact represented the amount received from the sale of the collateral pledged by him to the defendant to secure his debt, then he was entitled to have the amount thereof, over and above his debt, paid to him at once. Notwithstanding this fact, the bank did not deliver to Fishman the check representing the proceeds of the draft less the debt, which it had drawn payable to Fishman's order, immediately upon being advised of the fact that its draft had been paid. Instead, it held said check representing money it is now claimed in its behalf it then thought belonged to Fishman, from June 5th to July 13th or 14th, on one or the other of which dates it was delivered to him.

The significance of this delay in the delivery of the check and explanation thus offered in behalf of the defendant cannot be escaped. With respect to why he delayed the delivery of the check to Fishman, the defendant's cashier testified as follows on his direct examination:

"Q. 24. Why was that check held, Mr. Oglesby, after settlement was had with Richmond & Company? A. For the simple reason that we had held his note past due so long and had been unable to get him to pay and did not want to take any chances on paying anything that we would have to have back. I didn't want to turn any money over to him that we might possibly have to get back at a later date, and I held it until I thought the transaction had gone through before I delivered the money to him."

With reference to the same matters he testified on cross-examination as follows:

"Q. 76. Mr. Oglesby, if Mr. Emanuel Fishman's stock had sold for $531.70 and you thought that was the actual value of that stock, why did you hold Emanuel Fishman's money until July 13th follow-

ing when the stock was sold on June 4th and you got notice of the sale on June 5th? A. Two reasons, one was that he let the note run past due and I didn't want to take any chance—the stock was delivered in Memphis and if there was any error in it I wanted it to be caught before the money was turned over to him."

"Q. 77. Did you have any reason to believe that it was not alright? A. In dealing with anyone we do not consider responsible for the amount we turn over to them we try not to take any chances with them."

It is also of considerable significance to our mind that when asked specifically if he had any reason to believe that all was not right in the transaction, his answer, as indicated in the testimony quoted above, was hardly responsive to the inquiry. In justice to the cashier who, as stated, was the only witness testifying for the defendant, it must be said that a careful examination of his testimony fails to disclose that he at any place denies having knowledge of the fact that a mistake of some character had been made. Upon the other hand, his testimony clearly indicates that he realized the possibility of the defendant's being called upon to refund the money.

The cashier does not disclose what it was he knew that caused him to be of this belief and in considering of what his knowledge consisted, we are left to judge the matter by the surrounding facts and circumstances and from the opportunities he had to know about it. In addition to the facts hereinabove referred to, it appears that the defendant cashier had had considerable experience with stocks and their values. He had been connected with the defendant bank, either as vice president or cashier or both since May, 1927. Prior to that time he was engaged in the business of selling stocks and bonds listed on the New York and other exchanges, as well as stocks and bonds that were not listed on such exchange. He had served for a period of about three years as a national bank examiner. The experience thus gained from the pursuit of these occupations had caused him to become familiar with securities and their values, and he so testified. He likewise testified that while he was not familiar with all of the stocks dealt in on the New York Stock Exchange, yet that by virtue of his connection with the defendant bank, he had transactions dealing with such stocks rather frequently. He read the Commercial Appeal, a newspaper published in Memphis, carrying quotations of stock markets, and it can be fairly inferred from his testimony that he was in the habit of examining these quotations, at least to some extent. The very nature of his duties as cashier of the defendant bank required him to be familiar with the value of collateral held by it. The loan to Fishman was made in March, 1929, for the sum of $240. The certificate of stock issued to him and held as collateral by the defendant bank was dated March 8, 1929. The defendant's cashier knew the houses in Nashville that had placed this stock on the market, as

well as the price for which it was sold when it first came out. The loan was made on the strength of this stock. At the time it was ordered sold, the debt was more than three months past due and repeated efforts to get Fishman to pay it had been unsuccessful. He refused to pay any attention to the obligation. To assume that the defendant's cashier did not, under these circumstances, know the value of said collateral at the time he ordered it sold, would be to assume that he was remiss in his duties as cashier of said bank. This we are unwilling to do. Again, although asked about it repeatedly and specifically, the witness nowhere says that he was not advised as to the real value of this stock at the time the sale was ordered.

At the time of the transaction here involved Fishman's note had been, as stated, past due since February 17, 1930. Notwithstanding repeated efforts, the defendant had been unable to collect the amount of the debt from him. It is in the evidence, through the testimony of the defendant's cashier, that Fishman had no property other than the said collateral out of which the debt could be made. Being unable to get Fishman to pay any attention to the obligation, it was decided to sell the collateral. Under these circumsances, it is hardly probable that this course was determined upon without some idea of the amount that the stock would likely bring.

On the day following that on which the defendant first ordered the sale of the collateral, stock in the Fair was quoted at 27½ in the quotations in the New York Stock Exchange appearing in the Commercial Appeal of that date. In the same issue of that paper, stock in the Fair Stores Company was quoted on the local security market "8 bid" and "11 asked." Estimated on the basis of these quotations, twenty shares of stock in the Fair Stores Company was worth on the market from $330 to $390, less than twenty shares of stock in the Fair. The defendant's cashier was likewise aware of the fact that the stock held as collateral by the defendant would probably have to be sold on a local security market. He testifies that in giving the order of sale, he told the complainants' Jackson representative that the stock was handled through a Nashville house and that he thought the Nashville house could possibly find a buyer more readily than could be found through any other source.

From these facts, taken in connection with the positive testimony of the defendant's cashier, clearly indicating that he realized that there was a possibility of the defendant's having to refund the money paid it by complainant, we are forced to the conclusion that the delay in the delivery in the check to Fishman was due to the fact that the defendant, through its cashier, had knowledge of facts and circumstances from which he believed that there was something wrong with the transaction and which were amply sufficient to put the defendant upon inquiry. It was, therefore, the duty of the defendant to use reasonable diligence to ascertain the truth about the matter.

An inquiry addressed to complainants disclosing the information which caused it to believe that it might be called on to refund the money and which caused it to delay the delivery of the check to Fishman, whatever this information might have been, would have, no doubt, resulted in the discovery of the fact that the mistake had been made. Instead of doing this or making any other investigation about the matter of which it was admittedly suspicious, the defendant remained silent and inactive for more than a month, and finally paid the money over to Fishman without having made any effort whatever to ascertain the truth about the matter, when the means of so doing were easily within its reach. It cannot therefore be permitted to defeat complainant's right by urging an equitable estoppel based upon its having acted to its disadvantage in reliance upon complainants' innocent mistake. Regardless of whether or not the complainants were negligent in paying the draft and in failing to discover the mistake, the change in its position brought about by its act in paying the money over to Fishman was proximately due, not to negligence on the part of the complainants, but to its own failure to exercise reasonable diligence to discover the truth after it had knowledge of the facts and circumstances reasonably calculated to put it upon inquiry. This being true, the defendant cannot successfully set up its changed position as a defense to the recovery by complainants of the money belonging to them. Fourth Nat. Bank v. R. R., supra.

It having been found that its draft was paid by complainant through a mistake of fact, the burden rested on the defendant to prove the existence of circumstances which would make it inequitable to require it to refund the money. Hathaway v. Delaware County, 185 N. Y., 368, 78 N. E., 153, 13 L. R. A. (N. S.), 273, 113 Am. St. Rep., 909; Phetteplace v. Bucklin, 18 R. I. 297, 27 A. 211; Gibbons v. Perkins, 132 Misc., 583, 230 N. Y. S., 273; Ball v. Shepard, 202 N. Y., 247, 95 N. E., 719.

We hold that the defendant has failed to carry this burden, for the reason that it affirmatively appears from the testimony of its own witness that before its position was changed by the payment of the money to Fishman, it had knowledge of facts and circumstances sufficient to put it upon inquiry and that having this knowledge it failed to exercise reasonable diligence to determine the truth before it acted in the matter complained of.

The defendant's third assignment of error must, therefore, be sustained.

Under the circumstances of this case, we are not disposed to disturb the action of the chancellor in dividing the cost accrued in the court below between the parties. The assignment based on this action is therefore overruled.

The result is that the decree of the chancellor is modified to the ex-

tent of awarding to the complainants a recovery in the sum of $509.50, the amount sued for, together with the interest thereon from the 1st day of August, 1930, the day on which the demand made by the complainants was refused. In all other respects the decree of the chancellor is affirmed.

Heiskell and Senter, JJ., concur.